### In Re the Marriage of Michelle A. CIESLUK, Petitioner,

### and

### Christopher J. Ciesluk, Respondent.

### No. 04SC555.

Supreme Court of Colorado, En Banc.

June 6, 2005.

Ann Whalen Gill, PC, Ann Whalen Gill, Castle Rock, for Michelle A. Ciesluk.

Willoughby Law Firm, LLC, Kimberly R. Willoughby, Alisa Campbell, Denver, for Christopher J. Ciesluk.

Justice RICE delivered the Opinion of the Court.

In this post-dissolution proceeding between Michelle A. Ciesluk (Mother) and Christopher J. Ciesluk (Father), Mother appeals the trial court order denying her motion to modify parenting time pursuant to section 14–10–129, C.R.S. (2004). We hold that section 14–10–129, as amended, eliminates the three-part test set forth in *In re Marriage of Francis*, 919 P.2d 776, 784–85 (Colo.1996), including the presumption in favor of the majority time parent who is seeking to relocate. Instead, both parents share equally the burden of demonstrating what is in the child's best interests. Ultimately, it is incumbent upon the trial court to consider all of the relevant factors under subsection 14–10–129(2)(c) and to decide what arrangement will serve the child's best interests.

In light of this conclusion, we hold that the trial court abused its discretion because it improperly created a presumption in favor of Father in applying section 14–10–129 to the facts of this case. Accordingly, we reverse the court of appeals' holding and remand with instructions to return the case to the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

Mother and Father met and married in Nebraska in 1995. One child, Connor, was born to them on February 27, 1997. In September 2002, the parties amicably divorced. Pursuant to the separation agreement incorporated into the decree of dissolution, Mother is the primary residential parent for school residency and other legal residential requirements; Father has parenting time on two weekends and two weekday evenings per month. Mother and Father have joint parental responsibility and decision-making authority.

In February 2003, Mother, a Sprint employee for seven years, was laid off as a result of Sprint's workforce reduction in Colorado. She sought alternative employment in Colorado and in Arizona, where her father, brother, sister-in-law, and nephew reside. Though she was unable to find a comparable job in Colorado, Sprint interviewed her for a position in Arizona. However, Sprint refused to extend her an offer until she committed to relocating to Arizona.

Consequently, in March 2003, Mother filed a motion to modify parenting time [1] pursuant to section 14–10–129 to allow her to relocate to Arizona with Connor. Mother included with her motion a proposed parenting time schedule giving Father four unscheduled visits per year with thirty days notice, one week at Christmas, two weeks during the summer, and one week at spring break.[2] Mother proposed to pay half the airfare costs associated with these visits. When Mother and Father were unable to agree on these terms, Father opposed the motion and moved for the appointment of a special advocate to determine Connor's best interests.

The special advocate met with both parties together and individually, visited both parties at their respective homes, and met individually with Connor. She also interviewed the parties' respective friends and extended family, as well as Connor's teachers and principal. Based on her observations, she prepared a report using the factors in subsection 14–10–129(2)(c) to determine Connor's best interests. In her analysis, she concluded that, as a result of the relocation, Father's presence in Connor's life would be greatly reduced and that such reduction would have a negative impact on Connor. As a result, she recommended that it was in Connor's best interests to stay in close proximity to both Mother and Father.

---

1. Though Mother entitled the motion "Motion to Relocate with Child pursuant to C.R.S. 14–10–129(1)(a)(I,II)," the motion was the procedural and practical equivalent of a motion to modify parenting time.

2. At the subsequent hearing to modify parenting time, Mother submitted a new proposed parenting time schedule giving Father two overnights per month, one week at Christmas, one week at spring break, and four weeks during the summer, not including three day weekends such as President's day, Memorial Day, Labor Day, and conferences for school. This amounts to sixty-six overnights; significantly less than the 114 overnights Father has under the current parenting time schedule.

At the subsequent hearing to modify parenting time, at which Mother, Father, and the special advocate testified, the trial court first held that section 14–10–129 eliminates the three-part test set forth in *Francis*, including the presumption in favor of the majority time parent who is seeking to relocate. Instead, the trial court held that it was required to determine whether modification of parenting time is in the best interests of the child, taking into account all relevant factors in subsection 14–10–129(2)(c).

In applying this standard, the trial court adopted the special advocate's analysis, incorporated her recommendation into its order, and denied Mother's motion to modify parenting time, holding that "parenthood results in some sacrifice and it is better off for parents to remain in close proximity." In making this determination, the trial court gave substantial weight to the impact of the move on Connor's relationship with Father and to Mother's failure to establish how the move would "enhance" Connor. Mother appealed.

In *In re Marriage of Ciesluk*, 100 P.3d 527, 530 (Colo.App.2004), the court of appeals affirmed the trial court order in its entirety, holding that the legislature intended section 14–10–129 to overrule *Francis* and to eliminate the presumption favoring a majority time parent. The court of appeals further held that the trial court did not abuse its discretion in giving substantial weight to the impact of Mother's relocation on Connor's relationship with Father. *In re Marriage of Ciesluk*, 100 P.3d at 530.

On certiorari, Mother contends that the trial court misapplied section 14–10–129 in determining that it was not in Connor's best interests to modify parenting time. First, Mother argues that the trial court wrongly interpreted section 14–10–129 to eliminate the presumption in favor of the majority time parent articulated in *In re Marriage of Francis*. As a corollary, Mother argues that if section 14–10–129, as amended, discourag-

es her from relocating, it unconstitutionally infringes upon her right to travel.

Mother next argues that the trial court abused its discretion in applying the statutory factors contained in subsection 14–10–129(2)(c) to the facts of this case. Specifically, Mother contends that the trial court (1) improperly required her to show that the modification of parenting time would "enhance" Connor and (2) improperly relied upon a *Journal of Family Psychology* article in concluding that "it is better off for parents to remain in close proximity." Mother asserts that the effect of this abuse of discretion was to create an unconstitutional presumption in favor of Father and an insurmountable burden for majority time parents to overcome.

We hold that the trial court properly concluded that section 14–10–129 eliminates the *Francis* test, including the presumption in favor of the majority time parent. However, we conclude that the trial court abused its discretion in applying section 14–10–129 to the facts of this case, and that such abuse of discretion unconstitutionally infringed upon Mother's right to travel. Accordingly, we remand to the trial court for proceedings consistent with this opinion.

## II. Section 14–10–129 and the *Francis* Test

■ We first address whether the three-part test articulated in *Francis* remains viable in light of the General Assembly's recent amendments to section 14–10–129. Mother argues that section 14–10–129, as amended, simply modifies the best interests analysis set forth in *Francis*, but does not affect the presumption in favor of the majority time parent in relocation cases.[3] We disagree and conclude that section 14–10–129 eliminates the *Francis* test.

### A. The *Francis* Test

In *Francis*, we established a three-part test to determine whether a sole residential custodian's [4] proposed move was in the best

3. The terms "majority time parent" and "minority time parent" have no legal significance. We use them merely to reflect that Mother, not Father, is "the parent with whom the child resides

a majority of the time" pursuant to subsections 14–10–129(1)(b)(II), (2)(c).

4. As of February 1, 1999, the term "custody" in Colorado's Uniform Dissolution of Marriage Act

interests of the child. 919 P.2d at 784–85. First, a custodial parent had to present a prima facie case showing that there was a sensible reason for the move. *Id.* Once the custodial parent had presented a prima facie case, a presumption in favor of allowing the child to move with the custodial parent arose; the burden then shifted to the non-custodial parent to show that the move was not in the child's best interests.[5] The non-custodial parent could establish that the move was not in the child's best interests and overcome the presumption by showing that one of three factors had been met; namely, that (1) the custodial parent had consented to the modification of custody to the non-custodial parent; (2) the child had been integrated into the non-custodial parent's family with the custodial parent's consent; or (3) the child's present environment endangered his physical health or significantly impaired his emotional development ("the endangerment standard"). *Id.* at 785. If no credible evidence of endangerment existed, the non-custodial parent alternatively could overcome the presumption by establishing by a preponderance of evidence that the negative impact of the move cumulatively outweighed the advantages of remaining with the primary caregiver. *Id.*

### B. Amended Section 14–10–129

In response to dissatisfaction with the *Francis* test, the General Assembly amended section 14–10–129, effective September 1, 2001, to set forth a new procedure for determining whether modification of a parenting time order due to a majority time parent's relocation is in a child's best interests. *See* ch. 222, sec. 1, § 14–10–129, 2001 Colo. Sess.

Laws 761, 761–763; *see also* Audio Tape: Hearing on S.B. 01–029 Before the Senate Judiciary Comm., 63d Gen. Assem., 1st Reg. Sess. (Colo. Feb. 12, 2001)(on file with Colorado State Archives)(hereinafter Feb. 12 Hearing)(statements of Senator Gordon, Chairman, Senate Judiciary Committee; Beth Henson, family law attorney; Dr. Bill Austin, licensed Colorado psychologist in consultation with Colorado Interdisciplinary Committee on Children and Family; and Frances Fontana, President, Colorado State Interdisciplinary Committee).

The new legislative scheme retained the language set forth in subsection 14–10–129(2), which provides that:

> "the court shall not modify a prior order concerning parenting time that substantially changes the parenting time as well as changes the party with whom the child resides a majority of the time unless it finds ... that a change has occurred in the circumstances of the child or the party with whom the child resides the majority of the time ...."

In addition, the General Assembly retained the language in subsection 14–10–129(2) which requires that any modification be in the best interests of the child.

The General Assembly also chose to preserve the language of subsection 14–10–129(2) which provides that the court shall retain the parenting time schedule established in the prior decree unless there is an agreement between the parties to modify,[6] there is consent to allow the child to be integrated into the family of the moving party,[7] or the child's present environment is

---

has been replaced with the term "parental responsibilities." § 14–10–103(4), C.R.S. (2004). The term "parental responsibilities" includes two separate legal concepts: parenting time and decision-making responsibility. *See* § 14–10–124(1.5), C.R.S. (2004). A court is required to allocate parental responsibilities, including parenting time and decision-making responsibility, in accordance with the best interests of the child. § 14–10–124(1.5). Thus, the term "sole residential custodian" is no longer viable and has no meaning in the context of this case. As explained in the facts, Mother has twice as much parenting time as Father, and Mother and Father have joint parental and decision-making responsibilities. Mother is referred to as the primary

residential parent for purposes of school residency; however this term is not the legal equivalent of a sole residential custodian.

5. We noted that "[s]uch presumption is necessarily weakened to the extent parents share both residential and legal custody and we decline here to resolve the issue of how removal should be evaluated in a circumstance in which both parents truly share joint *residential* custody." *Francis*, 919 P.2d at 785.

6. § 14–10–129(2)(a).

7. § 14–10–129(2)(b).

dangerous.[8]

The General Assembly, however, elected to add a fourth situation in which a modification of an existing parenting time schedule is permitted, namely when a majority time parent intends to relocate with the child to a different geographical area.[9] § 14–10–129(2)(c). Thus, in the language of the statute, if a majority time parent "is intending to relocate with the child," a "change has occurred in the circumstances of the child or the party with whom the child resides the majority of the time" sufficient to cause the court to consider modifying a prior order concerning parenting time. § 14–10–129(2).

However, before a court may allow a majority time parent to relocate with the child, the new statutory language in subsection 14–10–129(2)(c) dictates that the court shall consider twenty-one relevant factors, including

eleven factors listed in subsection 14–10–124(1.5)(a), C.R.S. (2004),[10] and nine [11] entirely new factors specifically tailored to modification proceedings arising out of a majority time parent's desire to relocate. § 14–10–129(2)(c)(I)–(IX).[12]

## C. Section 14–10–129 Eliminates the *Francis* Presumption

We now address whether the presumption set forth in *Francis* survived these amendments to section 14–10–129. As is apparent from the above analysis of the statute before and after *Francis*, the General Assembly has created a new methodology by which courts are to evaluate relocation cases. *See* § 14–10–129(2)(c). This statutory scheme eliminates the *Francis* presumption in favor of the majority time parent and substitutes in its place a specific factual analysis designed

8. § 14–10–129(2)(d).

9. "The party with whom the child resides a majority of the time is intending to relocate with the child to a residence that substantially changes the geographical ties between the child and the other party." § 14–10–129(2)(c).

10. Subsection 14–10–124(1.5)(a) codifies the best interests of the child standard. The factors listed are:

(I) The wishes of the child's parents as to parenting time;
(II) The wishes of the child if he or she is sufficiently mature to express reasoned and independent preferences as to the parenting time schedule;
(III) The interaction and interrelationship of the child with his or her parents, his or her siblings, and any other person who may significantly affect the child's best interests;
(IV) The child's adjustment to his or her home, school, and community;
(V) The mental and physical health of all individuals involved, except that a disability alone shall not be a basis to deny or restrict parenting time;
(VI) The ability of the parties to encourage the sharing of love, affection, and contact between the child and the other party;
(VII) Whether the past pattern of involvement of the parties with the child reflects a system of values, time commitment, and mutual support;
(VIII) The physical proximity of the parties to each other as this relates to the practical considerations of parenting time;
(IX) Whether one of the parties has been a perpetrator of child abuse or neglect under section 18–6–401, C.R.S. or under the law of

any state, which factor shall be supported by credible evidence;
(X) Whether one of the parties has been a perpetrator of spouse abuse as defined in subsection (4) of this section, which factor shall be supported by credible evidence;
(XI) The ability of each party to place the needs of the child ahead of his or her own needs.

11. The factors listed in subsection 14–10–129(2)(c) are:

(I) The reasons why the party wishes to relocate with the child;
(II) The reasons why the opposing party is objecting to the proposed relocation;
(III) The history and quality of each party's relationship with the child since any previous parenting time order;
(IV) The educational opportunities for the child at the existing location and at the proposed new location;
(V) The presence or absence of extended family at the existing location and at the proposed new location;
(VI) Any advantages of the child remaining with the primary caregiver;
(VII) The anticipated impact of the move on the child;
(VIII) Whether the court will be able to fashion a reasonable parenting time schedule if the change requested is permitted; and
(IX) Any other relevant factors bearing on the best interests of the child.

12. The endangerment statute enunciated in part three of the *Francis* test and listed as a factor in the current statute no longer applies when a majority time parent seeks to relocate. § 14–10–129(1)(b)(II).

to aid the trial court in determining whether modification of parenting time in relocation cases is in the child's best interests. *See* § 14–10–129(c)(I)–(IX); § 14–10–124(1.5).

■■■ Interpretation of a statute is a question of law that we review de novo. *E.g.*, *United Airlines, Inc. v. Indus. Claim Appeals Office*, 993 P.2d 1152, 1157 (Colo.2000). In construing a statute, we strive to give effect to the intent of the legislature and adopt the statutory construction that best effectuates the purposes of the legislative scheme, looking first to the plain language of the statute. *E.g.*, *People v. Yascavage*, 101 P.3d 1090, 1093 (Colo.2004).

Here, the General Assembly's intent to eliminate the *Francis* presumption is readily apparent on the face of the statute. Though we need not look beyond the plain language of the statute, we nonetheless note that this reading of the statute is equally consistent with the legislative history of the statute, which indicates that legislators proposed the amendments in an effort to eliminate the *Francis* test. *See* Feb. 12 Hearing (statements of Senator Gordon, Beth Henson, Bill Austin, and Frances Fontana). For example, Senator Gordon, Chairman of the Senate Judiciary Committee and the bill's sponsor, opined that the *Francis* standard was simply too difficult for non-custodial parents to meet, stating that "what this bill is doing is changing the proof, the burden of proof in terms of who has to prove that the move is appropriate and by what level of proof." Feb. 12 Hearing.

Mother's arguments to the contrary are unpersuasive. Mother first argues that amended section 14–10–129 simply codifies the *Francis* analysis. As support for this argument, Mother notes that the list of factors in subsection 14–10–129(2)(c) parallels those laid out in *Francis*. *See* 919 P.2d at 785.[13] This argument is not accurate. The General Assembly codified three of the *Francis* factors[14] into subsection 14–10–129(2)(c), but did not incorporate the factor requiring a parent to show that "the proposed move will enhance the quality of life for the child."

Even still, the approved use of three of the four *Francis* factors in relocation cases has no effect on the plain language of the statute, which replaces the presumption in favor of the majority time parent with a liberal fact-driven analysis.

Mother also argues that our holding is contrary to the court of appeals' decision in *In re Marriage of Donovan*, 36 P.3d 207, 210 (Colo.App.2001), which upheld application of the *Francis* test in a relocation case even after the legislature amended section 14–10–129. Although this Court is not bound by court of appeals' decisions, we note that the court of appeals in *In re Marriage of Donovan* did not address section 14–10–129 because the parties in that case filed the motion to relocate in the year 2000. *See* 36 P.3d at 208. Amended section 14–10–129 did not become effective until September 1, 2001, and only applies to relocation motions filed after that date. *See* ch. 222, sec. 2, § 14–10–129, 2001 Colo. Sess. Laws 761, 763 ("The provisions of this act shall apply to all motions concerning modification of parenting time filed on or after the applicable effective date of this act."). Accordingly, the court of appeals decided *In re Marriage of Donovan* under *Francis*, the pre-amendment scheme. *See In re Marriage of Donovan*, 36 P.3d at 209–10. As a result, our conclusion is not contrary to the holding in *In re Marriage of Donovan*.

13. We held that when determining whether the disadvantages of moving are great enough to outweigh the advantages of staying with the same parent, "the trial court may consider: 1) whether there is a reasonable likelihood the proposed move will enhance the quality of life for the child and the custodial parent, including the short and long term effects of the move on the custodial parent's ability to support the child; 2) whether the court is able to fashion a reasonable visitation schedule for the non-custodial parent after the move and the extent of the non-custodial parent's involvement with the children at the old location; 3) whether there is a support system of family or friends, either at the new or old location; and 4) educational opportunities for the children at the new and old locations." *Francis*, 919 P.2d at 785. We held that if the cumulative weight of these factors together with others the trial court may find relevant outweighs the presumption favoring the custodial parent, then the removal petition should be denied. *Id.*

14. *See* § 14–10–129(2)(c)(IV), (V), (VIII).

· In conclusion, in amending section 14–10–129, the General Assembly intended to eliminate the *Francis* test in relocation cases, including the presumption in favor of the majority time parent seeking to relocate.

### III. Balancing the Interests of the Parents and the Child under Amended Section 14–10–129.

■ Having determined that the *Francis* presumption in favor of the majority time parent no longer applies in relocation cases, we turn next to Mother's alternative argument, namely that section 14–10–129, absent a presumption in favor of allowing her to move, discourages her from relocating, and unconstitutionally infringes upon her right to travel.

■ It is well established that a citizen has the right to travel between states. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 629–31, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) *overruled on other grounds by Edelman v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This right encompasses the right to "migrate, resettle, find a new job, and start a new life." *Id.* at 629, 89 S.Ct. 1322. "[I]t makes no difference that the parent who wishes to relocate is not prohibited outright from doing so; a legal rule that operates to chill the exercise of the right, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether." *Jaramillo v. Jaramillo,* 113 N.M. 57, 823 P.2d 299, 306 (1991)(citing *Shapiro,* 394 U.S. at 631, 89 S.Ct. 1322). Here, though section 14–10–129 does not prohibit outright a majority time parent from relocating, it chills the exercise of that parent's right to travel because, in seeking to relocate, that parent risks losing majority parent status with respect to the minor child.

However, a majority time parent's right to travel is not the sole constitutional right at issue in relocation cases. In addition, a minority time parent has an equally important constitutional right to the care and control of the child. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)("The liberty interest at issue in this case-the interest of parents in the care, cus-tody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)(discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Though consideration of the parents' competing constitutional interests is important in relocation cases, the conflict is not simply between the parents' needs and desires. *See Baures v. Lewis,* 167 N.J. 91, 770 A.2d 214, 229 (2001). Rather, the issue in relocation cases is the extent to which the parents' needs and desires are intertwined with the child's best interests. *See id.* Thus, relocation disputes present courts with a unique challenge: to promote the best interests of the child while affording protection equally between a majority time parent's right to travel and a minority time parent's right to parent.

### A. Balancing The Right To Travel, The Right To Parent, and the Best Interests of the Child

The interplay of a parent's right to travel and a parent's right to the care and control of his or her child in the context of a best interests analysis is a matter of first impression for this Court. However, as discussed below, we find the decisions of other courts that have encountered this issue to be instructive, including those of our own court of appeals. *See In re Marriage of Graham & Swim,* No. 03–1922, —— P.3d ——, ———— ——, 2005 WL 774412, at *3–4 (Colo.App. Apr.7, 2005); *LaChapelle v. Mitten,* 607 N.W.2d 151 (Minn.Ct.App.2000); *Watt v. Watt,* 971 P.2d 608 (Wyo.1999); *Jaramillo v. Jaramillo,* 113 N.M. 57, 823 P.2d 299 (1991).

Though most courts that have considered this question have acknowledged that the right to travel is implicated when a child's

majority time parent seeks to remove the child from the state,[15] these courts cannot agree on how to balance the right to travel with the rights of the minority time parent in a best interests of the child analysis. Instead, three distinct approaches have developed. The first, Wyoming's, elevates the relocating parent's right to travel over the other competing interests. *See Watt*, 971 P.2d at 615–16. The second approach, adopted in Minnesota, eliminates the need to balance the parents' competing constitutional rights in favor of elevating the child's welfare to a compelling state interest. *See LaChapelle*, 607 N.W.2d at 163–64. The third approach, New Mexico's, treats all the competing interests as equal, holding that both parents' constitutional interests, as well as the best interests of the child, will be best protected if each parent shares equally in the burden of demonstrating how the child's best interests will be impacted by the proposed relocation. *See Jaramillo*, 823 P.2d at 307–09.

### 1. Wyoming's Approach—Right to Travel is Absolute

The Wyoming Supreme Court's decision in *Watt* represents one approach to this problem. 971 P.2d at 615–16. Pursuant to Wyoming state law, a parent seeking a modification of custody has the burden of establishing that "a material and substantial change in circumstances [has] occurred, following the entry of the initial divorce decree, which outweigh[s] societal interest in supporting the doctrine of res judicata." *Id.* at 613. In deference to the custodial parent's right to travel, the court in *Watt* held that this burden could not be met merely by proving relocation of the custodial parent. *Id.* at 616. In reaching this conclusion, the court placed a higher priority on the constitutional right to travel than other states:

> The constitutional question posed is whether the rights of a parent and the duty of

the courts to adjudicate custody serve as a premise for restricting or inhibiting the freedom to travel of a citizen of the State of Wyoming and of the United States of America. We hold this to be impossible. The right of travel enjoyed by a citizen carries with it the right of a custodial parent to have the children move with that parent. This right is not to be denied, impaired, or disparaged unless clear evidence before the court demonstrates another substantial and material change of circumstance and establishes the detrimental effect of the move upon the children. While relocation certainly may be stressful to a child, the normal anxieties of a change of residence and the inherent difficulties that the increase in geographical distance between parents imposes are not considered to be 'detrimental' factors.

*Id.* at 615–16 (citations omitted).

This approach is no different in practice than the approach in *Francis* that we now reject because it effects a presumption in favor of a custodial parent seeking to relocate. Furthermore, it is contrary to Colorado's preferred state policy emphasizing a fact-driven approach in relocation cases. *See* § 14–10–129(2)(c). Finally, it ignores the rights of the minority time parent. For these reasons, we decline to adopt this approach in Colorado.

### 2. Minnesota's Approach—Best Interests of Child is a Compelling State Interest; Therefore, No Need to Balance Competing Constitutional Rights of Parents

Another approach to this problem is to elevate the child's welfare to a compelling state interest, thereby obviating the need to balance the parents' competing constitutional rights. *LaChapelle*, 607 N.W.2d at 163. In adopting this approach, the Minnesota court of appeals in *LaChapelle* recognized that the right to travel is qualified, and the depriva-

---

**15.** Some courts have held that removal cases do not implicate a parent's right to travel because removal statutes do not prohibit outright a parent's right to travel, but rather prohibit only a parent's right to travel with a child. *See, e.g., Lenz v. Lenz,* 40 S.W.3d 111, 118 n. 3 (Tex.App. 2000) *rev'd on other grounds by Lenz v. Lenz,* 79

S.W.3d 10 (Tex.2002). However, as we observed above, "a legal rule that operates to chill the exercise of the right, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether." *Jaramillo,* 823 P.2d at 306.

tion thereof justified, where the state acts to promote a compelling state interest. *Id.* at 163–64. Because the court deemed the promotion of a child's welfare to be a compelling state interest, the child's best interests effectively subjugated the relocating parent's right to travel. *Id.* at 164.

The United States Supreme Court frequently has emphasized the stringent nature of the compelling interest test, holding that "if 'compelling interest' really means what it says (and watering it down ... would subvert its rigor in the other fields where it is applied), many laws will not meet the test." *Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 888, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Supreme Court also has stressed that "in this highly sensitive constitutional area *'[o]nly the gravest abuses, endangering paramount interests,* give occasion for permissible limitation [of fundamental rights].'" *Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)(emphasis added)(quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)("[O]nly those interests of the highest order and not those otherwise served can overbalance legitimate claims to the free exercise of religion.").

In heeding these cautionary instructions from the Supreme Court, many state courts have held that "[s]hort of preventing harm to the child, the standard of 'best interest of the child' is insufficient to serve as a compelling state interest overruling a parent's fundamental rights." *In re Parentage of C.A.M.A.,* 154 Wash.2d 52, 109 P.3d 405, 410 (2005)(quoting *In re Custody of Smith,* 137 Wash.2d 1, 969 P.2d 21, 30 (1998)); *see also Rideout v. Riendeau,* 761 A.2d 291, 297 (Me.2000)(citing *Troxel,* 530 U.S. at 68–69, 120 S.Ct. 2054)(holding that the best inter-

ests of the child standard, standing alone, is insufficient for determining when the state may intervene in the decision-making of competent parents with respect to a third party's request for visitation with the children); *Mizrahi v. Cannon,* 375 N.J.Super. 221, 867 A.2d 490, 497 (2005)(holding that absent threatening harm to a child's welfare, the state lacks a sufficiently compelling justification for infringing on the fundamental right of parents to raise their children as they see fit).

Despite this stringent standard, the Minnesota court of appeals in *LaChapelle* relied on earlier Minnesota decisions which held only that the "the *paramount nature* of a child's best interests is a principle that has been part of Minnesota child welfare law for at least 100 years." *In re Welfare of M.P.,* 542 N.W.2d 71, 74 (Minn.Ct.App.1996)(emphasis added)(citing *In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn.1986), which noted that the best interests doctrine "has long been recognized as the common thread in cases determining ... the circumstances in which children are required to live" and adopted the best interests doctrine "as a paramount consideration" in termination of parental rights cases), *overruled in part on other grounds by In re Welfare of J.M.,* 574 N.W.2d 717, 722–24 (Minn.1998).

In addition, the Minnesota court of appeals relied on Minnesota case law, which allowed it to consider the "paramount question" of the child's best interests without reference to Minnesota's statutes on child custody. *LaChapelle,* 607 N.W.2d at 163 (citing *State ex rel. Flint v. Flint,* 63 Minn. 187, 65 N.W. 272, 272 (1895) for the proposition that "in a custody dispute, in spite of other considerations, *including application of statutory law,* '[t]he paramount question was ... what would be most for the benefit of the infant'"(emphasis added)).[16]

---

16. The Minnesota court of appeals also relied on the Idaho court of appeals' opinion in *Ziegler v. Ziegler,* 107 Idaho 527, 691 P.2d 773, 780 (Idaho App.1985), in concluding that the best interests of the child is a compelling state interest. However, the court in *Ziegler* merely held that "providing and assuring the maximum opportunities for parental love, guidance, support and companionship is a compelling state interest that war-

rants ... reasonable interference with the constitutional right to travel *when necessary.*" 691 P.2d at 780 (emphasis added). Because the facts in *Ziegler* supported the trial court's conclusion that "there was danger that either of the parties might take the children and flee thus depriving the other parent of reasonable visitation and depriving the children of the parental love, affection, support, guidance and companionship to

Citing the holding in *LaChapelle*, our court of appeals adopted this approach in *In re Marriage of Graham & Swim*, 2005 WL 774412, at *3–4, —— P.3d at —— – —— holding that "a parent's right to travel yields to the state's compelling interest in protecting a child through application of the best interests standard."

We decline to adopt this approach in Colorado.[17] First, in the absence of demonstrated harm to the child, the best interests of the child standard is insufficient to serve as a compelling state interest overruling the parents' fundamental rights. *See In re Parentage of C.A.M.A.*, 109 P.3d at 410 (quoting *In re Custody of Smith*, 969 P.2d at 30); *see also Rideout*, 761 A.2d at 297 (citing *Troxel*, 530 U.S. at 68–69, 120 S.Ct. 2054); *Mizrahi*, 867 A.2d at 497.

Second, this approach is not consistent with the plain language of section 14–10–129, which expressly requires a trial court to balance the competing constitutional rights of the parents. Specifically, factors (I) and (II) of subsection 14–10–129(2)(c) require a trial court to consider the reasons in support of a party's wish to relocate with the child and the reasons in support of a party's opposition to a relocation. *See* § 14–10–129(c)(I)(directing the court to consider "the reasons why the party wishes to relocate with the child"); § 14–10–129(c)(II)(directing the court to consider "the reasons why the opposing party is objecting to the proposed relocation)." These factors are undoubtedly "weighing factors" because they require the court to bal-

ance the rights of the majority and minority time parents in the context of a best interests determination.

In addition, factor (VIII) in subsection 14–10–129(2)(c) requires that the court determine "whether the court will be able to fashion a reasonable parenting time schedule if the change requested is permitted." This factor also contemplates that the court will balance the interests of the parents and the best interests of the child. Thus, the language of the statute requires a balancing of the parental interests.

Finally, from a practical standpoint, adopting the best interests of the child as a compelling state interest to the exclusion of balancing the parents' rights could potentially make divorced parents captives of Colorado. This is because a parent's ability to relocate would become subject to the changing views of social scientists and other experts who hold strong, but conflicting, philosophical positions as to the theoretical "best interests of the child." [18] For these reasons, we decline to adopt this approach.

### 3. New Mexico's Approach: Parents' and Child's Interests Are Best Protected Through An Equal Sharing of Burden

The third approach that we consider today is illustrated in the New Mexico Supreme Court's decision in *Jaramillo v. Jaramillo*, 823 P.2d at 307–09, and was later adopted by the Maryland court of appeals in *Braun v.*

---

which they were entitled," the court of appeals held that interference with the mother's right to travel was necessary. *Id.* at 780–81. Hence, the holding in *Ziegler* is limited to the facts of the case.

**17.** With the exception of the recent decision in *In re Marriage of Graham & Swim*, no Colorado court has held that the best interests of the child is a compelling state interest that obviates the need to balance the competing constitutional rights of parents. To the extent that *In re Marriage of Graham & Swim* does so, we overrule it.

**18.** *See generally* Sanford L. Braver et. al., *Relocation of Children after Divorce and Children's Best Interests: New Evidence and Legal Considerations*, J. Fam. Psychol., June 2003, at 206 (concluding that "there is no empirical basis on which to justify a legal presumption that a move by a custodial parent ... will necessarily confer

benefits on the children she takes with her"); Joan B. Kelly & Michael E. Lamb, *Using Child Development Research to Make Appropriate Custody and Access Decisions For Young Children*, 38 Fam. & Conciliation Cts. Rev. 297, 309 (2000)(concluding that "[r]egardless of who has been the primary caretaker ... children benefit from the extensive contact with both parents that fosters meaningful father-child and mother-child relationships"); Judith S. Wallerstein & Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce*, 30 Fam. L.Q. 305, 318 (1996)(concluding that "[w]hen a child is de facto in the primary residential or physical custody of one parent, that parent should be able to relocate with the child, except in unusual circumstances").

*Headley,* 131 Md.App. 588, 750 A.2d 624, 635 (2000). The court in *Jaramillo* considered not only the majority time parent's right to travel and the state's concerns in protecting the best interests of the child, but also the minority time parent's right to maintain close association and frequent contact with the child. 823 P.2d at 304–06.

In addressing how to allocate burdens to protect these competing concerns, the court first recognized the constitutional right to travel, holding that "the protection afforded the right to travel in the child-custody context has been explicitly recognized by ... this Court." *Id.*

However, the New Mexico court also acknowledged the equal right of a parent to maintain a close association with his or her child.

> By the same token, we believe that the other parent's right to maintain his or her close association and frequent contact with the child should be equally free from any unfavorable presumption that would place him or her under the burden of showing that the proposed removal of the child would be contrary to the child's best interests. '[F]reedom of personal choice in matters of family life is a fundamental liberty interest.'

*Id.* at 305–06 (citing *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)); *see also Troxel,* 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)(holding that parents have a fundamental right to make decisions as to care, custody, and control of their children).

In discussing whether to adopt a presumption in favor of either parent, the court noted that "[n]either presumption, except by happenstance, serves the statutory goal ... of determining and implementing the best interests of the child." *Id.* at 307. The court also discussed criticisms of procedure by presumption:

> Procedure by presumption is always cheaper and easier than individualized de-

termination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

*Id.* (citations omitted)(citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). As a result, the court held that:

> [A]llocating burdens and presumptions in this context does violence to both parents' rights, jeopardizes the true goal of determining what in fact is in the child's best interest, and substitutes procedural formalism for the admittedly difficult task of determining, on the facts, how best to accommodate the interests of all parties before the court, both parents and children.

*Id.* at 305.

Based on this conclusion, the court in *Jaramillo* adopted a rule that "neither party is under a burden to prove which arrangement will best promote the child's interests; both parents share equally the burden of demonstrating how the child's best interests will be served." *Id.* at 308.

## B. The New Mexico Approach in *Jaramillo* Best Comports with Colorado Law

For the reasons set forth below, we adopt the reasoning set forth in *Jaramillo* for relocation disputes in Colorado. Thus, we hold that both parents' constitutional interests, as well as the best interests of the child, will be best protected if each parent shares equally in the burden of demonstrating how the child's best interests will be impacted by the proposed relocation.

In so holding, we are attempting to interpret the statute in a manner which is consistent with the plain language and with our understanding of the General Assemblies intentions.[19] *Braun,* 750 A.2d at 635. In ad-

---

19. The legislative history of section 14–10–129 is contradictory on this point. *Compare* Feb. 12 Hearing (statement of Beth Henson, a family law attorney who helped draft the bill, that section 14–10–129 "places the burden equally on both

parents to prove their case as to what is in the child's best interests"), *with* Audio Tape: Hearing on S.B. 01–029 Before the House Civil Justice and Judiciary Comm., 63d Gen. Assem., 1st Reg. Sess. (Colo. Apr. 26, 2001)(on file with

dition, we are adopting a statutory interpretation that both effectuates the preferred legislative procedure and protects the rights of the parties before the court. *See People v. Gallegos*, 692 P.2d 1074, 1078 (Colo. 1984)("Such an allocation of burdens ensures in each case an affirmative demonstration that the legislatively preferred policy ... is being carried out.").

We conclude that, ultimately, it is incumbent upon the trial court to consider all the relevant factors to determine what arrangement will serve the child's best interests. Though the best interests of the child are of primary importance in making this determination, they do not automatically overcome the constitutional interests of the parents, which must be weighed against each other in the best interests analysis.

## C. Applying the *Jaramillo* Approach in Colorado

Child parenting disputes present agonizing decisions for trial court judges. However, as this case demonstrates, such cases are increasingly common before the courts. According to the U.S. Census Bureau, about 1 in 6 Americans moves each year. Kristin A. Hansen, U.S. Census Bureau, *Geographic Mobility*, (last revised 2001) *at* http://www.census. gov/population/www/ pop-profile/geomob. html (last visited May 24, 2005). Approximately 7 million people a year move from state to state. *Id.* The "average American" makes 11.7 moves in a lifetime. *Id.* Because of the ordinary needs of both parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location.

Neither the child nor the parents benefit from repeated appearances before the court or from the uncertainty caused by such appearances. Thus, the General Assembly

rightly emphasized the necessity to review and decide relocation hearings promptly by giving such cases priority on the docket.[20]

Because neither party is under a burden to prove which arrangement will best promote the child's interests, both parents share equally the burden of demonstrating how the child's best interests will be served. As a result, it is incumbent on the trial court to consider each of the twenty-one factors set forth by the General Assembly. In so doing, the court shall consider as much information as the parties choose to submit and may elicit further information on its own motion from other sources, including special advocates.

As demonstrated by this case, however, one of the biggest concerns for the judge is the starting point for analysis. Often a parent who intends to relocate will do so only if the revised parenting plan ordered by the judge is acceptable. Consequently, relocation hearings may resemble a negotiation between the majority time and the minority time parent, with no clear-cut details or particulars upon which the judge can base findings.

Consistent with the holding in this case, a court must begin its analysis with each parent on equal footing; a court may not presume either that a child is better off or disadvantaged by relocating with the majority time parent. Rather, the majority time parent has the duty to present specific, nonspeculative information about the child's proposed new living conditions, as well as a concrete plan for modifying parenting time as a result of the move. The minority time parent may choose to contest the relocation in its totality, and thus seek to become the majority time or primary residential parent. Alternatively, the minority time parent may choose not to contest the relocation, but rather object to the revised parenting plan proposed by the majority time parent. In such a circumstance, the minority time parent has the responsibility to propose his or her own

Colorado State Archives) (statements of Senator Gordon, Chairman of the Senate Judiciary Committee; and Steve Lass, representative of the Colorado Bar Association, that the parent wishing to move has the burden of proving that the move is in the best interests of the child).

**20.** "A court hearing on any modification of parenting time due to an intent to relocate shall be given a priority on the court's docket." § 14–10–129(2)(c).

parenting plan. Thus, each parent has the burden to persuade the court that the relocation of the child will be in or contrary to the child's best interests, or that the parenting plan he or she proposes should be adopted by the court.

The focus of the court, however, should be the best interests of the child. The court may decide that it is not in the best interests of the child to relocate with the majority time parent. Then, if the majority time parent still wishes to relocate, a new parenting time plan will be necessary.

Alternatively, the court may decide that it is in the best interests of the child to relocate with the majority time parent. In that situation, the court must fashion a parenting time plan which protects the constitutional right of the minority time parent to care for and control the child.

In either event, the court must thoroughly disclose the reasons for its decision and make specific findings with respect to each of the statutory factors.

## IV. The Trial Court Abused its Discretion in Denying Mother's Motion to Relocate

■ Having clarified that both parents share equally the burden of demonstrating what arrangement will serve the child's best interests in a modification proceeding, we now address the trial court's application of subsection 14–10–129(2)(c) to the facts of this case.

■ A best interests determination under subsection 14–10–129(2)(c) is a matter within the sound discretion of the trial court. *In re Marriage of Finer*, 920 P.2d 325, 328 (Colo. App.1996). Accordingly, we review the trial court's findings for an abuse of discretion.

Here, the trial court committed an abuse of discretion where it prematurely concluded that it would be in Connor's best interests to remain in close proximity to both parents. The effect of this conclusion was to create a presumption in Father's favor contrary to the legislative intent of subsection 14–129(2)(c).

First, the trial court erred when it failed to properly address whether remaining with his primary caregiver would provide Connor any advantages pursuant to subsection 14–10–129(2)(c)(VI). The term "primary caregiver" is not defined in the statute, so we must give the term its plain and ordinary meaning. *See e.g., Weld County Sch. Dist. RE–12 v. Bymer*, 955 P.2d 550, 554 (Colo.1998). The plain meaning of the term "primary" is "first in importance; chief; principal; main"; the plain meaning of "caregiver" is "a person who takes care of someone requiring close attention, as a young child or invalid." *Webster's New World College Dictionary* 222, 1140 (MacMillan 4th ed.1999). In this case, Mother's larger share of parenting time and her status as primary residential parent suggest that she is the "primary caregiver." Accordingly, to properly analyze this factor, a court must determine whether Connor would enjoy any advantages in remaining with Mother if she were to relocate to Arizona.

Based on the evidence, a court reasonably could have concluded that Connor would benefit directly and indirectly by remaining with Mother if she were to relocate to Arizona. As a direct benefit, Connor would enjoy the stability of remaining with his majority time parent. Connor also would benefit from having day-to-day relationships with his grandfather, uncle, aunt, and nephew. Finally, Mother's increased financial stability and family support would undoubtedly increase her own happiness, which would benefit Connor by giving him a more stable home life. This indirect benefit to Connor is not diminished simply because it primarily benefits Mother.

The trial court, however, failed to consider any of these potential advantages to Connor, and instead discussed Mother and Father's parenting styles, stating:

> Connor is close to his mother and is also close to his father. Both parents are somewhat controlling in their parenting style father being more so. Neither parent seems to be very successful in eliciting Connor's view on the important issues; rather they approach him by having him understand what they would like him to

believe about certain issues. The school states that they cannot tell any difference in Connor when he has been with his mother or his father. It is a positive sign that where Connor resides is not affecting him at school.

This is a situation where both parents could benefit from expanding their parenting style. It would be important for both households to agree on some basic rules and guidelines, and ways of approaching discipline. This would be in Connor's best interests.

Having failed to discuss advantages to Connor in relocating with Mother, the trial court then proceeded to relate its concern that Mother:

"continues to believe that whatever is in her best interest is also in Connor's best interest. The Court notes her reasons to relocate. They are all from her point of view and her benefit, job, help from her family which then, I guess, are indirect benefits to Connor but there was nothing directly about how this would *enhance* Connor." (emphasis added).

As discussed in Part II.C, *supra*, requiring a parent to show that a move will "enhance the quality of life for the child" is a remnant of the *Francis* test that the General Assembly did not adopt in amending section 14–10–129. *See* § 14–10–129(2)(c); *Francis*, 919 P.2d at 785. Furthermore, none of the factors listed in subsection 14–10–129(2)(c) requires the majority time parent to establish that the move will directly benefit the child. Most importantly, the trial court did not impose an equal burden on Father to demonstrate the benefits to Connor using the subsection 14–10–129(2)(c) factors.

Thus, the trial court improperly required Mother to show "enhancement," it improperly ignored indirect benefits in its subsection 14–10–129(2)(c) analysis, and it erroneously imposed a burden on Mother that it did not impose on Father. As a result, Mother was required to carry an unequal share of the burden in demonstrating Connor's best interests.

The trial court aggravated these errors in its subsection 14–10–129(2)(c) analysis by relying on a general conclusion that parents should remain in close proximity to the child. In reaching this conclusion, the trial court cited an article from the *Journal of Family Psychology*. Braver, *supra* note 18. Though the article's authors stated, "our data cannot establish with certainty that moves cause children substantial harm," [21] the trial court nevertheless interpreted the article as concluding that "a child is generally not benefited by moving away with the custodial parent from a non-custodial parent." Presumably based upon the Braver's article, the court then concluded that "[p]arenthood results in some sacrifice and it is better off for parents to remain in close proximity."

The only way for a trial court to adhere to this generalization in relocation disputes would be to categorically deny the majority time parent's request to modify parenting time. The trial court ostensibly tempered this hard-line approach by suggesting that Mother could overcome this presumption by showing that the move would "enhance" Connor. However, as discussed above, this was also in error because "enhancement" should not be part of the analysis, and because the trial court would not accept evidence of indirect benefits to Connor. As a result, the effect of this generalization was to create a presumption in favor of the minority time parent opposing relocation.

Moreover, Braver's article represents only one of many schools of thought on how parenting time affects children. *See supra* note 18. One theory provides that a child's interests are so aligned with the well-being of the majority time parent that that person's decision on behalf of the child should be honored unless there is proof that the decisions are bad ones. *See e.g.*, Wallerstein & Tanke, *supra* note 18. Another theory suggests that both parents are entitled to raise the child and that it is extremely important for a child to develop a relationship with both parents. *See e.g.*, Kelly & Lamb, *supra* note 18.

A court's duty is not to determine which of these theories is correct. Rather, a court's sole duty in relocation cases is to determine

21. The Braver Study, *supra* note 18, at 215.

the best interests of a child based upon the facts of each individual case. In performing this duty, the court shall specifically set forth its considerations with respect to all relevant factors, including any benefits the child may enjoy by relocating with the majority time parent.

The trial court in this case failed to perform its duty in accordance with the statute because it imposed an unequal burden on Mother and created a presumption in favor of Father that was potentially contrary to Connor's best interests. We therefore reverse the court of appeals' holding and remand with instructions to return the case to the trial court for proceedings consistent with this opinion.