24CA1137 Marriage of Walda 08-28-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1137
El Paso County District Court No. 15DR31546
Honorable Laura N. Findorff, Judge

In re the Marriage of

Abigail LaVoo,

Appellee,

and

Kevin Walda,

Appellant.

ORDER AFFIRMED

Division V
Opinion by JUDGE WELLING
Grove and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 28, 2025

Law Office of Joel M. Pratt, LLC, Joel M. Pratt, Colorado Springs, Colorado, for
Appellee

Jones Law Firm, P.C., William H. Garvey, Greenwood Village, Colorado, for
Appellant

¶ 1   Kevin Walda (father) appeals the trial court's order reducing his parenting time with his children and granting Abigail LaVoo (mother) sole decision-making authority in all matters except religion.  We affirm the trial court's order.

## I.   Background

¶ 2   Mother and father were married in 2012 and share two minor children, A.W. and K.W.  In 2016, the court dissolved their marriage.  In its final orders, the court ordered a 5-2-2-5 parenting time plan, giving each parent 50-50 parenting time (i.e., each parent was allocated 182.5 overnights per year).  The final orders also granted mother and father joint decision-making authority.

¶ 3   In 2023, father filed a motion to modify his parenting time to "support[] splitting time between C[olorado] and M[ichigan]."  In his motion, father sought to reduce his parenting time, citing a "substantial increase in the cost of living, loss of employment and [a] need for [him] to care for elderly and ailing parents."

¶ 4   Approximately six months later (while father's motion was still pending), mother filed her own motion to modify.  In her motion, mother requested that the court modify the allocation of decision-making to grant her sole decision-making authority.  Mother alleged

1

that retaining joint decision-making would "endanger[] the children's physical health and/or significantly impair[] the children's emotional development" because father "ignores [m]other's attempts to discuss decisions" and "provides blanket objections" to solutions she proposes.

¶ 5 The court set both motions to modify for a single hearing. Before the hearing, the parties filed a joint trial management certificate. In the joint trial management certificate, father proposed a parenting time plan that would reduce the frequency of his parenting time from 50-50 to approximately 37-63. His proposed plan would have allocated parenting time as follows:

> Starting the first Monday in April of every year, the parties would start a week on/week off parenting time schedule . . . .
>
> The week on/week off schedule would continue until the start of the children's summer school holiday. If father has parenting time the week that the children's school concludes for the summer, he will just continue with his parenting time. If [m]other is exercising parenting time the week that the children's school concludes for the summer, [m]other will exchange the children with [f]ather . . . on the second full day of the children's summer school holiday.

Father will have parenting time with the minor children from the second full day of their summer school holiday until 14 days prior to the children's first day of school in the fall. Mother will have parenting time with the children for the final fourteen days of the children's summer school holiday . . . . Mother will then have parenting time with the children until the first Monday of the children's school year, when the parties will again start a week on/week off parenting time schedule . . . .

The parties will continue with a week on/week off parenting time until the start of [m]other's week of parenting time after October 15th each year. Mother will have parenting time with the children from the start of her week of parenting time after October 15th until the first Monday after April 1st when the parties resume week on/week off parenting time with [f]ather starting his parenting time on the first Monday after April 1st.

Father is not requesting any modification to the parties' holiday parenting time schedule.

¶ 6    Mother proposed two parenting time plans, depending on whether father chose to partially relocate to Michigan. If father decided to remain in Colorado full-time, mother proposed that the parties retain their then-existing 5-2-2-5 parenting time plan. If, on the other hand, father chose to partially relocate to Michigan, mother proposed the following parenting time plan:

> Father [will] have parenting time from 2 days after summer break begins until July 6 every year . . . . In addition, [f]ather should have parenting time on the 2nd and 4th weekend of the months he is requesting to be in Colorado . . . with the exception of August, from Friday, after school until Monday drop off at school . . . .
>
> Father should have Winter Break in even years from the 2nd day after the [S]chool [B]reak begins until 2 days before school resumes and the children's Thanksgiving [B]reak in odd years. Father has stated in the past that he does not want Spring Break but [f]ather should have the opportunity to have Spring Break in odd years should he decide to use it . . . . Thanksgiving and Spring Break parenting should start the first day after school lets out and end one day before school resumes. Mother should have Winter Break in odd years and Thanksgiving Break and Spring [B]reak in even years.

¶ 7    During the hearing, the court heard testimony from father, mother, and K.W.'s academic language therapist. Following the hearing, the court adopted mother's proposed parenting time plan which, according to father, granted him only sixty overnights per year. The trial court also "grant[ed] sole decision[-]making to [m]other in all areas except religion." Father appeals.

## II. Analysis

¶ 8 On appeal, father contends that the trial court erred with respect to both its allocation of parenting time and decision-making rulings. We address each challenge in turn below.

### A. Parenting Time

¶ 9 Father advances two challenges to the court's modification of parenting time. First, father contends that that the trial court erred because it "restricted" his parenting time without applying the correct legal standard. And second, he contends that the trial court's best-interests findings aren't supported by the record. We aren't persuaded that the court erred in either respect.

#### 1. Standard of Review

¶ 10 A trial court has "broad discretion when modifying an existing parenting time order," and we review the court's modification decision for an abuse of discretion. *In re Marriage of Barker*, 251 P.3d 591, 592 (Colo. App. 2010). A court abuses its discretion if "its decision is manifestly arbitrary, unreasonable, or unfair; is based on an erroneous understanding or application of the law; or misconstrues or misapplies the law." *In re Marriage of Badawiyeh*, 2023 COA 4, ¶ 9. Whether the court applied the correct legal

standard, however, is a question we review de novo. *In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 11.

### 2. Restriction of Parenting Time

¶ 11    We first address father's contention that the trial court "restricted" his parenting time without applying the proper legal standard. Because we conclude that the court didn't restrict father's parenting time, we reject this contention.

### a. Legal Principles

¶ 12    Subject to exceptions not applicable here, "the court may . . . *modify* an order granting or denying parenting time rights whenever such . . . modification would serve the best interests of the child." § 14-10-129(1)(a)(I), C.R.S. 2025 (emphasis added). But a heightened standard applies when a court *restricts* a parent's parenting time. *See* § 14-10-129(1)(b)(I). A court can't "restrict a parent's parenting time rights unless it finds that the parenting time would endanger the child's physical health or significantly impair the child's emotional development." *Id.* Thus, as relevant here, a trial court need only make endangerment findings if its

6

modification of parenting time constitutes a restriction. *See* § 14-10-129(1)(a)(I), (b)(I).[1]

b.     The Trial Court Didn't Restrict Father's Parenting Time Rights

¶ 13     Father's argument that the court applied the incorrect legal standard when it entered its order modifying parenting time rests on two necessary premises: (1) the trial court restricted his parenting time rights; and (2) because of that restriction, the trial court should have, but failed to, make endangerment findings. Father's argument fails at the outset, however, because the trial court's order modifying parenting time didn't constitute a *restriction* of father's parenting time.

---

[1] Findings beyond just the best interests of the child are required under other circumstances, which aren't present here. For example, additional findings are required — potentially including endangerment findings — when the modified order "substantially changes the parenting time as well as changes the party with whom the child resides a majority of the time." § 14-10-129(2), C.R.S. 2025. But because under the existing order "the parties share equal parenting responsibilities, any subsequent modification of that arrangement is governed by the best interests standard," not section 14-10-129(2). *In re Marriage of Stewart*, 43 P.3d 740, 742 (Colo. App. 2002). Also, additional findings are required when one parent seeks to relocate with the child. *See* 14-10-129(2)(c); *In re Marriage of Ciesluk*, 113 P.3d 135, 140-42 (Colo. 2005). Although the purported impetus for father's motion to modify was his partial relocation to Michigan, because he wasn't proposing to relocate with the children, section 14-10-129(2)(c) and *Ciesluk* aren't implicated.

¶ 14    What constitutes a restriction on parenting time — as opposed to a mere modification — isn't defined in section 14-10-129. Because of this lack of guidance, divisions of this court have attempted to determine what constitutes a restriction on a case-by-case basis. In assessing what constitutes a restriction, divisions of this court have focused on quantitative versus qualitative reductions in parenting time when determining what constitutes a restriction in parenting time. *See In re Marriage of Dale*, 2025 COA 29, ¶ 32 (*cert. granted in part* July 21, 2025); *In re Marriage of West*, 94 P.3d 1248, 1251 (Colo. App. 2004).

¶ 15    In *West*, the trial court reduced a father's summer parenting time by fourteen overnights in granting a motion filed by the children's mother. 94 P.3d at 1249-50. The father appealed, arguing that the trial court erred by reducing his parenting time based on the best interests of the children. *Id.* When considering whether endangerment findings were required, the division concluded that "determining whether to apply the best interests standard or the endangerment standard may involve inquiry into both the quantitative and the qualitative aspects of the proposed change to parenting time, as well as the reason or reasons

8

advanced for the change." *Id.* at 1251. The division then determined that the trial court's reduction didn't involve a qualitative change and that the quantitative change was "one of relatively limited magnitude." *Id.* Under these facts, the division concluded that the trial court didn't restrict the father's parenting time, and, therefore, the trial court didn't need to make endangerment findings. *Id.*

¶ 16     Recently, a division of this court considered the quantitative/qualitative distinction invoked in *West*. *See Dale*, ¶¶ 15-16. In *Dale*, the father requested that the trial court modify his parenting time to accommodate his work schedule. *Id.* at ¶¶ 2-3. After a hearing, the trial court applied the best interests of the child factors and reduced the father's parenting time by forty-five overnights. *Id.* at ¶¶ 2, 4-5. On appeal, the father contended that the trial court restricted his parenting time and should have made endangerment findings. *Id.* at 7. In its opinion, the division addressed whether a purely quantitative reduction in parenting time could constitute a parenting time restriction. *Id.* at 15. The division concluded that it couldn't, stating "a purely quantitative reduction in a parent's parenting time is not a restriction on that

parent's parenting time rights under section 14-10-129(1)(b)(I)." *Id.* at ¶ 32. Instead, the division determined that a court restricts parenting time rights when it "impos[es] a qualitative control over the manner, location, or environment in which the parent engages in parenting time, such as a requirement that parenting time be supervised, a prohibition of overnight visits with a particular parent, or a limitation on the location where a parent may exercise parenting time." *Id.*

¶ 17    Regardless of whether we apply the qualitative test laid out by the division in *Dale* or the qualitative/quantitative approach endorsed by the division in *West*, our conclusion is the same: The court's modification didn't constitute a restriction.

¶ 18    To begin, father doesn't argue in his briefing to us that the court's modified parenting time order imposed any qualitative limitation on father's parenting time. Such limitations would include imposing a supervision requirement or limiting parenting time to prohibit overnights. *See Dale*, ¶ 32. No such limitations or conditions were imposed here. Instead, like in *Dale*, the modification in this case was purely quantitative. *See id.* at ¶¶ 32-33. Thus, if we were to apply the test set forth in *Dale*, we would

10

conclude, on this basis alone, that the court's order didn't constitute a restriction on father's parenting time.

¶ 19    Even if we apply the test set forth in *West,* we reach the same conclusion.  Recall, it was father who initially filed the motion to modify seeking to reduce his parenting time.  According to the trial court's assessment of father's motion, father requested to reduce his parenting time by modifying the 50-50 allocation to 37-63.  And because *father* requested a reduction in his parenting time, the most relevant baseline for considering the magnitude of the quantitative reduction the court ultimately adopted was father's requested reduction.  In other words, in determining whether the quantitative reduction the court adopted constitutes a restriction, the primary comparison for its allocation should be to the 37-63 plan father sought, not the 50-50 parenting time plan the parties had been operating under.

¶ 20    Moreover, in determining whether the court's order constituted a quantitative restriction, it's the amount of parenting time that the court allocated to father that is relevant, not the amount he actually anticipates exercising.  While father contends in his briefing to us that the court reduced his parenting time from 50-50 to 16-84 —

accordingly, allocating him only approximately sixty overnights per year — this contention doesn't appear to account for all of parenting time father is entitled to under the court's order (just the time that he *anticipates exercising* under the new order). Based on our review of the order, it appears that the trial court's modified parenting time plan entitles father to approximately eighty overnights per year (i.e., a 22-78 allocation, not a 16-84 allocation).

¶ 21     Thus, in assessing whether the court's order constituted a quantitative restriction, we compare the 37-63 parenting time plan father requested to the 22-78 allocation that the court ordered. While this is a substantial change (certainly as compared to the 50-50 plan the parties had been operating under), we aren't persuaded that it constitutes a restriction. After all, father was allocated approximately 60% of the overnights he sought. While we certainly understand why father is frustrated and feels aggrieved by the court's order, we can't conclude that the court's substantial reduction in his parenting time constituted a restriction.

¶ 22     We are further convinced that the trial court's parenting time plan doesn't constitute a restriction based on the trial court's finding that father had voluntarily forfeited twenty-four weeks of

parenting time between 2023 and early 2024. As the trial court observed, the amount of parenting time that father actually exercised during this time isn't substantially more than the eighty overnights he is entitled to under the trial court's modified plan. Thus, even giving weight to the quantitative changes in the court's modified parenting time order, we conclude that the trial court didn't restrict father's parenting time.

¶ 23 And because the court didn't restrict father's parenting time, the trial court wasn't required to make endangerment findings under section 14-10-129(1)(b)(I). Accordingly, it wasn't error for the trial court to base its modified parenting time orders on the best interests of the children.

### 3. Best Interests of the Children Findings

¶ 24 In his reply brief, father argues for the first time that, even if the court wasn't required to make endangerment findings, the trial court still erred by finding that the parenting time plan it adopted was in the best interests of the children. Although we need not address this argument because father didn't raise it in his opening brief, *see In re Marriage of Drexler*, 2013 COA 43, ¶ 24 (declining to address arguments raised for the first time in a reply brief), we

13

nevertheless conclude that the record supports the trial court's best interests findings.

¶ 25    "In determining the best interests of the child for purposes of parenting time, the court shall consider all relevant factors." § 14-10-124(1.5)(a), C.R.S. 2025.  These factors include, as relevant here, (1) "[t]he interaction and interrelationship of the child with his or her parents, his or her siblings, and any other person who may significantly affect the child's best interests"; (2) "[t]he child's adjustment to his or her home, school, and community"; (3) "[t]he ability of the parties to encourage the sharing of love, affection, and contact between the child and the other party"; (4) "[w]hether the past pattern of involvement of the parties with the child reflects a system of values, time commitment, and mutual support"; (5) "[t]he physical proximity of the parties to each other as this relates to the practical considerations of parenting time"; and (6) "[t]he ability of each party to place the needs of the child ahead of his or her own needs." § 14-10-124(1.5)(a)(III), (IV), (VI)-(VIII), (XI).  The trial court's findings track these factors, and the record supports each of the court's findings.

¶ 26    First, the trial court found that "the children have strong relationships with their stepsiblings" from mother's remarriage and that the children's relationship with father's family isn't "as consistent." This finding is supported by mother's testimony that the children have a "great" relationship with their stepbrothers and stepdad and that the children's stepbrothers and stepdad play with the children and teach them various skills. And while father testified that the children "have a pretty good relationship" with his extended family in Michigan, the record shows that this relationship is not as close due to the physical distance. That mother is now divorced from the stepdad is of no moment because it isn't a part of the record and wasn't presented to the trial court at the time it issued its order. *See In re Edilson*, 637 P.2d 362, 364 (Colo. 1981) ("Evidence which was not presented to the trial court will not be considered on review.").

¶ 27    Second, the trial court found that "the children have been in the same schools and activities effectively since the parties' divorce and seem well adjusted" and that the children are involved in extracurricular activities, and "K.W. has a therapist [in Colorado]." This finding is supported by both mother's and father's testimony.

15

Father testified that the children like their school in Colorado, and mother testified that the children participate in various extracurricular activities in Colorado and that K.W. sees a therapist in Colorado.

¶ 28 Third, the trial court found that father doesn't "ha[ve] the ability to encourage the sharing of love, affection and contact between the children and their mother." In support of this finding, the trial court observed that father "made no positive comments about [m]other and based on the testimony regarding doctor's appointments alone, he regularly disparages [m]other in front of the minor children." This finding is supported by mother's testimony that father disparages her in front of the children at doctor's appointments.

¶ 29 Fourth, the trial court found that "[f]ather does not participate in activities that [m]other sets up for the children." Again, mother's testimony supports this finding. Mother testified that father wouldn't take A.W. to her swim meets and wouldn't take the children to their martial arts belt tests. She also testified that father didn't attend some of the children's piano or guitar concerts. Father's testimony also supports this finding. He indicated that

16

mother is heavily involved in activities with the children and said that "[mother] has a lot of activities she likes to do with the children." The trial court also found, and the record supports, that father voluntarily reduced his involvement in the children's lives and forfeited twenty-four weeks of parenting time in the year prior.

¶ 30    Fifth, the trial court found that it wasn't clear where father lives but concluded that he doesn't "reside in Colorado on a full-time basis" and that it would have to "fashion a long-distance parenting plan." In his motion to modify, in the joint trial management certificate, and during his testimony, father made conflicting statements about where he would be living. Specifically, in the joint trial management certificate, father stated he "was forced to relocate to the state of Michigan," but during his testimony, father stated that he wouldn't be changing his residence from Colorado. Father's testimony also established, however, that he planned to work outside of Colorado and that he would spend the majority of his time with the children in Michigan. This evidence supports the trial court's conclusion that it needed to create a long-distance parenting time plan because mother and father wouldn't be living in close proximity to each other for an

entire year. That father is currently living in Colorado full-time isn't part of the record and wasn't before the trial court at the time. Therefore, it's of no moment that father apparently resides in Colorado. *See Edilson,* 637 P.2d at 364.

¶ 31 And sixth, the trial court found that father put his own needs ahead of the children's needs by interfering with their medical appointments, not supporting K.W.'s tutoring, and forfeiting parenting time. Again, the record supports that father voluntarily forfeited twenty-four weeks of parenting time. Additionally, mother's testimony indicated that father had previously canceled medical appointments after pulling the children out of school and failed to assist K.W. with his tutoring exercises.

¶ 32 Because the trial court considered the factors relevant to whether the adopted parenting time plan was in the best interests of the children and because its findings are supported by the record, the trial court didn't abuse its discretion in concluding that the parenting time plan it ordered was in the children's best interest.

## B. Decision-Making

¶ 33 We next address father's contention that the trial court erred by granting mother sole decision-making authority. As part of this contention, father argues that (1) the trial court's findings aren't supported by the record, and (2) the trial court violated his due process rights by considering facts not in evidence. For the reasons set forth below, we disagree.

### 1. The Trial Court's Findings Were Supported by the Record

¶ 34 Father asserts that the trial court erred by granting mother sole decision-making responsibility because its findings aren't supported by the record. Again, we disagree.

#### a. Legal Principles and Standard of Review

¶ 35 Pursuant to section 14-10-131(2), C.R.S. 2025, the trial court

> shall not modify a custody decree or a decree allocating decision-making responsibility unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or the child's custodian or party to whom decision-making responsibility was allocated and that the modification is necessary to serve the best interests of the child.

19

¶ 36 But the court must retain the prior decree's allocation of joint decision-making unless, as relevant here, "[t]he retention of the allocation of decision-making responsibility would endanger the child's physical health or significantly impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." § 14-10-131(2)(c).

¶ 37 When modifying parental responsibilities, the trial court has broad discretion, and "we exercise every presumption in favor of upholding its decisions." *In re Marriage of Wenciker*, 2022 COA 74, ¶ 26. "What constitutes endangerment is a highly individualized determination, and we won't disturb the trial court's findings on the issue if they are supported by the record." *Id.* (citations omitted). If conflicting evidence is presented, "the trial court's findings resolving such conflicts are binding on review if they have record support." *Id.*

b. Application

¶ 38 In contesting the adequacy of the trial court's factual findings, father contends that the trial court relied on anecdotal evidence presented at the hearing and failed to consider alternative

inferences when assessing father's reasoning for taking certain actions. But the court isn't required to discount evidence because it's "anecdotal," nor is it required to draw any particular inferences. Rather, it's the trial court's sole providence to assess witness credibility and determine what weight, if any, to accord and what inferences to draw from the evidence it receives. *See In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007) ("It is the responsibility of the trial court as the trier of fact to determine the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence."). And our review of the record convinces us that the trial court properly considered evidence admitted at trial and, after making extensive credibility determinations and weighing the evidence, that it made findings supported by the evidence it admitted.

¶ 39 In support of its decision to allocate sole decision-making authority to mother, the court made findings pursuant to section 14-10-131(2)(c), stating that "[f]ather's actions . . . constitute[d] an endangerment to the children's physical health or [would] significantly impair their emotional development" and "given that [f]ather ha[d] ignored orders regarding decision[-]making, . . . any

21

alleged harm to the children in changing decision[-]making from joint to sole decision[-]making, [wa]s outweighed to the advantages of the children in that they w[ould] no longer have to wait for necessary appointments for [f]ather to consent." In support of these findings, the court also found that, historically, mother and father hadn't managed to cooperatively make major medical, dental, and mental health decisions for the children; father had tried to circumvent court orders in the past; and father had refused to consent to joint decisions to control mother. Both mother's and father's testimony supports these findings.

¶ 40    First, the record shows that mother and father have required significant court intervention for major decisions regarding their children, including decisions related to allergy medication, orthodontic care, and therapy. Father admitted that coparenting had been challenging and that it had been many years since he and mother had made a major decision together. And mother testified that the court had resolved disagreements regarding multiple medical decisions in previous years. Indeed, because of these impasses, the court had previously granted mother temporary

22

tiebreaking decision-making regarding orthodontic/dental care for A.W. and allergy medication for both children.

¶ 41 Second, evidence admitted at the hearing demonstrates that, at least once, father had attempted to circumvent the court's orders. Evidence showed that the court ordered therapy for K.W., but, notwithstanding this order, father refused to complete the necessary documents for K.W. to attend therapy unless mother paid the entire cost.

¶ 42 And third, the evidence in the record supports that father had refused to consent to many other decisions and failed to act in the children's best interests. For example, evidence from the hearing indicates that father (1) delayed K.W.'s therapy by refusing to complete required paperwork; (2) requested that K.W. not be given testing accommodations at school and failed to attend two individualized education program meetings; (3) failed to assist K.W. with reading lessons; (4) declined to take A.W. to an orthodontist to fix her expander when it fell out; and (5) cancelled medical appointments after taking the children out of school.

¶ 43 Given that the parties have required extensive court intervention and considering father's actions with regard to court

orders concerning the children's medical, mental health, and dental appointments and treatment and the children's education, the trial court didn't err by concluding that father's actions endanger the "children's physical health or significantly impair their emotional development" and that any alleged harm in granting mother sole decision-making authority was "outweighed to the advantages of the children in that they w[ould] no longer have to wait for necessary appointments for [f]ather to consent."

¶ 44 Thus, the trial court didn't abuse its discretion by granting mother sole decision-making authority.

## 2. Due Process

¶ 45 Father next attempts to convert his argument that the court's findings aren't supported by the record into a due process contention by asserting that his rights were violated because the court "considered facts that were never testified to or admitted into evidence." But because the record supports the court's findings — and father doesn't otherwise challenge the adequacy of the proceedings — we aren't persuaded that father's due process rights were violated.

## III. Disposition

¶ 46 The order is affirmed.

JUDGE GROVE and JUDGE JOHNSON concur.