25CA1846 Peo in Interest of JV 05-21-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1846
Arapahoe County District Court No. 22JV216
Honorable Bonnie McLean, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.V., a Child,

and Concerning B.A.F.S. and W.V.,

Appellants.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE DUNN
J. Jones and Fox, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

---

John Christofferson, Interim County Attorney, Michael J. Valentine, Deputy County Attorney, Sylvia Geiger, Assistant County Attorney, Aurora, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant B.A.F.S.

Joel M. Pratt, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant W.V.

¶ 1     W.V. (father) and B.A.F.S. (mother) appeal the judgment terminating their parent-child legal relationships with J.V. (the child).  We affirm.

## I.     Background

¶ 2     In March 2022, the Arapahoe County Department of Human Services (the Department) received a report that mother was using illicit substances.  Following an investigation, the Department removed the child from mother's care and filed a petition in dependency or neglect.  At that time, the Department couldn't find father, but it soon located him in Florida.  Both parents made no-fault admissions to the petition, and the juvenile court adjudicated the child dependent or neglected.

¶ 3     After a dispositional hearing, the juvenile court adopted treatment plans for the parents.  Both plans required the parents to provide protective parenting, participate in family time, demonstrate financial stability, abstain from criminal activity, and remain in contact with the Department.  Mother's treatment plan also required her to address her substance abuse and mental health issues.

¶ 4    More than two years later, the Department planned to return the child to mother's care with an allocation of parental responsibilities (APR) between the parents. In anticipation of that goal, the Department completed an "address check" and discovered that mother had been arrested a few months earlier and had an active protection order, which she was violating; as a result, the Department moved to restrict mother's parenting time to supervised visits. Over the next six months, mother's participation waned and father didn't make the necessary arrangements for the child to live with him in either Florida or Colorado.

¶ 5    In June 2025, the Department moved to terminate the parents' parental rights. The juvenile court held an evidentiary hearing in August 2025. After hearing the evidence, the court terminated the parent-child legal relationships between the parents and the child.

   II.    Interstate Compact on the Placement of Children (ICPC)

¶ 6    Father asserts that the juvenile court erred by requiring an ICPC home study before placing the child in his care in Florida. In the alternative, he maintains that the Department failed to make

2

reasonable efforts to rectify the ICPC denial. We aren't persuaded by either argument.

¶ 7 We review de novo whether the juvenile court properly applied the ICPC. *People in Interest of O.J.R.*, 2025 COA 78, ¶ 13. Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the court's factual findings for clear error and review de novo its legal determination. *Id.*

¶ 8 The ICPC is an interstate agreement that facilitates the placement and provision of services to children being placed by one state's child protective services agency in a home in another state. *People in Interest of I.J.O.*, 2019 COA 151, ¶ 9. Under the ICPC, a "sending state" must notify a "receiving state" of its intent to send a child into the receiving state, and the receiving state typically completes a home study before accepting the child for placement in its state. § 24-60-1802, art. III(b), (d), C.R.S. 2023; *see also O.J.R.*, ¶ 19 (noting that, even though the General Assembly enacted a revised version of the ICPC in 2024, the 2023 version remains in effect until thirty-five states pass the revised version).

¶ 9      In April 2023, the Department notified child protective services in Florida of its intent to place the child with father.  The Florida authorities initiated a home study and requested information from father, including fingerprints from anyone living in his home, but father didn't follow through, so Florida denied placement.  In February 2024, the Department sent a second request; this time, a paternal great-uncle who was staying in the home refused to submit to fingerprinting, and placement was again denied.  At the termination hearing, father's expert explained that the great-uncle wouldn't provide his fingerprints because, in his Haitian culture, there were "certain beliefs about government."  And though father reported to the caseworker that he was going to look for his own apartment in Florida so that he could restart the ICPC process, he never obtained different housing in Florida.

¶ 10      A few weeks before the termination hearing, father filed a motion, asserting, among other things, that the ICPC doesn't apply to the placement of children with an out-of-state parent.  In support, father directed the juvenile court's attention to decisions from other jurisdictions that have decided that the ICPC doesn't apply to parents.  *See, e.g.*, *D.L. v. S.B.*, 201 N.E.3d 771, 777 (N.Y.

4

2022). Notably, Florida, the state involved in this case, isn't one of those jurisdictions. *See Dep't of Child. & Fams. v. Benway*, 745 So. 2d 437, 439 (Fla. Dist. Ct. App. 1999).

¶ 11    During the pendency of the case, no Colorado appellate court had yet decided whether the ICPC applies to placement with a parent. *See I.J.O.*, ¶ 11. However, shortly after the juvenile court ordered termination, a division of this court announced *O.J.R.*, which joined those jurisdictions that have determined that the ICPC doesn't apply to placement with parents. *O.J.R.*, ¶ 30.

¶ 12    Father now asks us to apply *O.J.R.*, conclude that the juvenile court erred by requiring him to complete the ICPC process, and reverse the termination judgment. In response, the Department and guardian ad litem assert that we shouldn't apply *O.J.R.* because (1) the case doesn't apply retroactively, *see People in Interest of C.A.K.*, 652 P.2d 603, 607 (Colo. 1982) (describing the test for retroactive application of new case law); or (2) father waived his appellate argument by participating in the ICPC process, *see People in Interest of T.E.R.*, 2013 COA 73, ¶ 26 (noting that a party may waive an appellate argument by not making a timely request for relief).

5

¶ 13    We need not decide these points because, even if *O.J.R.* applies, we still discern no error.  Notably, although the *O.J.R.* division determined that an ICPC home study isn't *required* before a court places a child in another state, nothing in the opinion suggests that a department is *prohibited* from initiating an ICPC home study.  To the contrary, the division specifically noted that its "conclusion d[id] not excuse Colorado juvenile courts and departments of human services from ensuring that children are safe when placed with out-of-state parents."  *O.J.R.*, ¶ 28.  And one way in which a court and department may ensure a child's safety when placing a child out-of-state is through an ICPC home study.

¶ 14    This case is also distinguishable from *O.J.R.* because the record in that case established that the authorities in New York agreed to supervise the child's placement in that state without an ICPC home study.  *See id.* at ¶ 33.  But here, we see nothing in the record to suggest that the Florida authorities would have done the same, especially considering that Florida courts have determined that the ICPC *does* apply to placement with parents.  *See Benway*, 745 So. 2d at 439.

¶ 15    Having determined that the juvenile court didn't err by applying the ICPC, we now turn to father's assertion that the Department failed "to make reasonable efforts to help [him] rectify the problems so that a home study [could] be passed." *See I.J.O.*, ¶ 17.  To that end, father maintains that the Department (1) should have spoken with the paternal great-uncle or (2) provided resources for housing and employment in Colorado.  But we aren't convinced that the caseworker was required to speak with the great-uncle, and even if she was, we can't see how doing so would have changed the outcome of the ICPC home study, given the circumstances described above.  And father doesn't explain how the provision of resources in Colorado would have assisted him with passing the home study in Florida.

## III.    Equal Protection

¶ 16    Father contends that he was deprived of equal protection under the United States and Colorado Constitutions because the Department treated him differently from mother based on gender.  We aren't persuaded.

¶ 17    The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Although the Colorado Constitution does not contain an identical provision, the due process clause of the Colorado Constitution implies a similar guarantee." *People v. Castillo*, 2022 COA 20, ¶ 17. "We review equal protection claims de novo." *Howard v. People*, 2020 CO 15, ¶ 11.

¶ 18     An equal protection violation occurs when the government arbitrarily treats a group of people differently from other people who are similarly situated. *Salazar v. Indus. Claim Appeals Off.*, 2022 COA 13, ¶ 34. Classifications based on gender are subject to intermediate scrutiny, which requires a showing that the classification furthers a sufficiently important governmental interest. *People v. Diaz*, 2015 CO 28, ¶ 25 n.7.

¶ 19     Father hasn't established that he and mother were treated differently because of gender. He maintains that, while the Department provided mother with "years of treatment, support, and a managed transition of the child back to her care," he received "relatively little" in comparison. But he doesn't explain how this differential treatment had anything to do with gender. Indeed, if the parents' roles were reversed (i.e., if father was the custodial parent

8

and mother supported return to his care), it seems that the Department would have provided father with the same attention that it provided mother. In other words, to the extent the Department treated the parents differently, nothing in the record suggests that it did so because of gender.[1]

## IV. Constitutional Right to Travel

¶ 20    Father argues that the juvenile court and the Department violated his constitutional right to travel. We disagree.

¶ 21    A citizen has a constitutional right to travel between states, which includes the right to resettle, find a new job, and start a new life. *In re Marriage of Ciesluk*, 113 P.3d 135, 142 (Colo. 2005). Generally, a rule that operates to chill a parent's exercise of the right to travel, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether. *Id.* We review an alleged violation of a constitutional right de novo. *See People v. Janis*, 2018 CO 89, ¶ 14.

¶ 22    Father asserts that he was "coerced" into moving to Colorado in violation of his constitutional right to travel. But the record

---

[1] At oral argument, father agreed that the analysis ends if the record doesn't demonstrate different treatment based on gender.

belies this assertion. We see nothing in the record — and father hasn't directed us to anything — establishing that the juvenile court or the Department required him to move to Colorado. Rather, the record clearly shows that father volunteered, on his own, to move to Colorado to improve his chances of reuniting with the child. To be sure, promptly relocating to Colorado may have helped father to succeed in this case. But he could have also completed an ICPC home study in Florida. He did neither.

¶ 23 Because the record doesn't establish that the juvenile court or the Department required father to move to Colorado or attempted to chill his right to remain in Florida, we discern no error. *See Heninger v. Charnes*, 613 P.2d 884, 887 (Colo. 1980) (concluding that the appellant's license revocation didn't burden his constitutional right to travel because he was "neither locked into nor fenced out of the state of Colorado").

V. Termination of Parental Rights

¶ 24 The parents maintain that the juvenile court erred by terminating their parental rights. We disagree.

### A.   Termination Criteria and Standard of Review

¶ 25    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent hasn't reasonably complied with an appropriate treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 26    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 27    The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's discretion.  *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).  We therefore can't reweigh the evidence or substitute our judgment for

11

that of the juvenile court. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

### B. Reasonable Efforts

¶ 28    Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts. We disagree.

### 1. Applicable Law

¶ 29    To determine fitness under section 19-3-604(1)(c), the juvenile court must consider whether a county department of human services made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's reasonable efforts obligation is satisfied if it provides services consistent with section 19-3-208. § 19-1-103(114).

¶ 30    The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of*

12

*My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. In doing so, the court may consider a parent's unwillingness to participate in services. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

### 2. Father

¶ 31 Father argues that the Department didn't (1) establish "quality contacts" with him; (2) make timely and "culturally responsive" ICPC referrals; or (3) engage in diligent searches for relatives. We aren't persuaded.

¶ 32 First, father asserts that the caseworker needed to make "quality contacts" with him each month, as described in the Department's own regulations. But these regulations don't mention anything about "quality contacts." Rather, the relevant regulation requires only that a caseworker make "monthly engagement" with a parent living out of state through "telephone calls, letters, or electronic communication." Dep't of Hum. Servs. Rule 7.204(B)(3), 12 Code Colo. Regs. 2509-3. And the record shows that the caseworker did just that. In any event, section 19-3-208 (not the Department's own regulations) guides our review, and nothing in that statute requires the caseworker to do anything more to satisfy the reasonable efforts requirement.

¶ 33    Next, father contends that the Department failed to make reasonable efforts because (1) both ICPC home studies were delayed by several months, and (2) the ICPC home studies weren't "culturally responsive." As to the first point, father doesn't explain how any delay could have impacted the outcome of the case, considering that he never complied with the ICPC process and eventually abandoned that process. As to the second issue, father doesn't specifically explain how the process wasn't culturally responsive or what the Department needed to do to correct it. Nor does he direct us to any legal authority that would require the Department to make such efforts to satisfy the reasonable efforts standard.

¶ 34    Finally, father maintains that the Department didn't engage in diligent searches for relatives. Specifically, he submits that the Department failed to follow up with the three individuals that he had suggested as possible placement options. But the record shows that the Department ran background checks on all three people father suggested: One person didn't pass the background check, another person lived with father, and the third person said that she could be a "support" but not a placement. Considering that all

three people weren't appropriate placement options, we aren't convinced that the Department failed to make reasonable efforts.

¶ 35    Ultimately, father suggests that the juvenile court had no reason to reject his expert's testimony on these three issues. But it isn't our role to second-guess the court's witness credibility determinations. *See People v. Harlan*, 109 P.3d 616, 627-28 (Colo. 2005); *Rocky Mountain Gun Owners v. Polis*, 2020 CO 66, ¶ 75 n.14 (holding that a court doesn't have to accept even unrebutted expert testimony); *Scott v. People*, 444 P.2d 388, 393 (Colo. 1968) (noting that a fact finder isn't required to accept expert testimony). And if the record supports the court's findings, as they do here, we can't substitute our judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29.

### 3.    Mother

¶ 36    Mother contends that the Department didn't provide her with family time throughout the case. We discern no reversible error.

¶ 37    To satisfy the reasonable efforts requirement, a department must provide "[f]amily time services for parents with children or youth in out-of-home placement." § 19-3-208(2)(b)(IV). Family time services must be provided "as determined necessary and

15

appropriate by individual case plans." § 19-3-208(2)(a), (b). Because the juvenile court must make decisions about family time, it can't delegate its authority to do so to other parties, such as a department. *See People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005).

¶ 38 To begin, mother contends that the Department didn't provide her with family time for two weeks at the very beginning of the case or expand her family time quickly enough. However, the record is undisputed that, until the end of December 2024, the Department provided increasing amounts of family time (in which she ultimately had the child in her care for two weeks at a time), along with decreasing levels of supervision, resulting in the child's near return home to mother. We aren't convinced that a short delay at the beginning of the case could have had any impact on her ability to reunite with the child. Likewise, considering that mother had extensive family time, we can't see how any delays in changes to the supervision levels resulted in a lack of reasonable efforts.

¶ 39 The heart of mother's argument, however, is that after the juvenile court restricted her family time at the end of December 2024, the Department failed to provide her with family time as

ordered by the court. In short, the record shows that the Department moved to restrict mother's family time to supervised community visits, which mother agreed to, but the Department didn't offer her a supervised community visit until shortly before the termination hearing. While the record supports her factual assertion, we discern no reversible error.

¶ 40 After the juvenile court restricted mother's family time, the Department offered her virtual visits until it could arrange for someone to supervise community visits. The Department initially believed that one of its family time providers could supervise visits, but the Department later reported that the provider wasn't able to do so. The Department reached out to mother in hopes of finding a relative or other appropriate support to supervise the community visits. Mother provided the name of a relative, but that person didn't pass a background check.

¶ 41 At a hearing in February 2025, mother's counsel requested supervised visits at the Department until community visits could be arranged. In doing so, counsel emphasized that her request wasn't an agreement to a new restriction; rather, she just wanted to "get [mother and the child] in a room together." Notably, the

Department never asked to restrict mother's family time thereafter, and the Department didn't offer a supervised community visit until the foster parents agreed to supervise one in August 2025.

¶ 42 Mother maintains that the Department needed to do more to make sure the community visits happened or, alternatively, request that the juvenile court restrict her family time. Because the Department didn't do either, mother asserts that we should reverse the judgment. We decline to do so because, although the Department's actions were imperfect, given mother's disengagement with her treatment plan, we aren't convinced that these shortcomings justify reversal. *See* C.A.R. 35(c) ("The appellate court may disregard any error or defect not affecting the substantial rights of the parties."); *see also People in Interest of E.S.*, 2021 COA 79, ¶ 27 (noting that the lack of visitation might be harmless in light of a parent's "noncompliance with other parts of [the] treatment plan").

¶ 43 As noted, the Department continued to provide mother with family time after the restriction. But mother didn't consistently attend that family time. And when the Department finally offered her a community visit, she didn't show up for that visit. Taking all

this together, we can't say that the Department did not make reasonable efforts by failing to provide community visits when it was providing in-person visits that mother wasn't attending.

### C. Treatment Plan Compliance and Fitness

¶ 44 Father asserts that the juvenile court erred by finding that he hadn't successfully complied with his treatment plan and was unfit. We disagree.

¶ 45 It is the parent's obligation to ensure compliance with and the success of a treatment plan. *People in Interest of J.A.S.*, 160 P.3d 257, 260 (Colo. App. 2007). Although absolute compliance with a treatment plan isn't required, even substantial compliance may not be sufficient to correct or improve the parent's conduct or condition, or to render the parent fit. *People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005).

¶ 46 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions.

*People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008). But if the evidence doesn't support a finding that a parent is unfit, the child's "need for permanency alone [isn't] sufficient to terminate" the parent-child legal relationship. *S.R.N.J-S.*, ¶ 60.

¶ 47 First, father contends that he complied with all the components in his treatment plan. The juvenile court found that, although father had "checked the boxes on some of the treatment plan," he hadn't successfully complied with the plan such that he was fit. That finding is not without record support. Among other things, the evidence established that father

- never demonstrated to the Department that he had safe, stable, and suitable housing for the child in Florida;

- violated the safety plan during an unsupervised visit by allowing mother to attend one of his visits when she wasn't authorized to do so;

20

- didn't fully disclose the people who would be in the home with him and the child during one of his visits to Colorado, and those unknown people were aggressive with the caseworker and were smoking marijuana in the home during the visit;

- had only limited face-to-face contact with the child, such that they hadn't developed a significant parent-child relationship;

- didn't have a job or housing lined up if he decided to move to Colorado;

- claimed he had plenty of money (enough to purchase new cars for himself and his father) but provided minimal financial support to his child throughout the case; and

- had gaps in his treatment plan and had not demonstrated that he could meet the child's needs, according to the caseworker.

¶ 48    Though we might have weighed the evidence differently had it been our call, it's not.  And because there is record support for the court's finding that that father didn't fully comply with the plan's

21

components, we may not reweigh the evidence or substitute our judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29.

¶ 49 Second, father argues that the Department didn't establish that he was an unfit parent. Rather, he claims that the juvenile court terminated his parental rights based on the child's need for permanency alone, which isn't permissible. *See id.* But as described above, father didn't fully comply with his treatment plan. *See D.P.*, 181 P.3d at 408. The court also relied on father's unwillingness to comply with the ICPC process, "get his own place," or make the necessary arrangements to provide a stable home for the child in Colorado. Taken together, we conclude that the evidence was sufficient to establish that father was "unable or unwilling to give the child reasonable parental care." § 19-3-604(2). Because the evidence satisfies the statutory criteria for unfitness, we can't reweigh evidence or substitute our judgment to reach a different result. *See S.Z.S.*, ¶ 29.

### D. Fit Within a Reasonable Time

¶ 50 Both parents assert that the juvenile court erred by finding that they couldn't become fit within a reasonable time. We disagree.

¶ 51     In determining whether the parent can become fit within a reasonable time, a juvenile court may consider whether any change has occurred during the case, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). The determination of a reasonable period is fact specific and varies from case to case. *S.Z.S.*, ¶ 25. But a reasonable time isn't an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *A.J.*, 143 P.3d at 1152. And when, as in this case, a child is under six years old, the court must also consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123(1)(a), C.R.S. 2025.

¶ 52     As for father, the juvenile court rejected his assertion that he could become fit within a reasonable time, finding that, "[i]n three and half years, he's done almost nothing . . . to get his son back." For example, the court noted that father could have complied with the ICPC process or ensured that he had his own place so he could pass the ICPC home study. Considering the length of time that the

23

child had already been out of the home, the court concluded that waiting any longer for father to become a fit parent wasn't in the child's best interests.

¶ 53    The record supports the juvenile court's findings. As previously described, father didn't comply with the ICPC process in Florida, and two different ICPC home studies were denied. Father told the caseworker that he would look for an apartment in Florida so that he could pass an ICPC home study, but he never did. And after the child was removed from mother's care in December 2024, father claimed that he would move to Colorado so that he could be the child's custodial parent. More than eight months passed since father said he would move, and he hadn't made any progress toward completing that task. Father testified that he'd given notice to his employer in Florida and would move in the next few weeks but admitted that he hadn't made any arrangements for employment or housing. In the caseworker's opinion, extending the case wasn't in the child's best interests, considering that father had had multiple "opportunities" over a nearly four-year period but had been unwilling to take advantage of them.

¶ 54 On appeal, father asserts that he could become fit within a reasonable time because he only needed about ninety days to move to Colorado and get established. But the juvenile court rejected this same argument for the reasons described above. And because the record supports the court's findings, we can't substitute our judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29.

¶ 55 As for mother, the juvenile court determined that she couldn't become fit within a reasonable time, noting that, although she was "doing well in treatment" until December 2024, her compliance "completely [fell] off [for] almost a year." During 2025, mother last saw the child in May, "stood up the child [for] the last two visits," and didn't participate in any substance abuse and mental health treatment.

¶ 56 The record supports the juvenile court's findings. As already described in detail above, the record indicates that mother was substantially complying with the main components of her treatment plan and was exercising increasing family time until the child was in her care for two full weeks at a time. But the Department discovered that mother had an undisclosed criminal case and protection order (which she was violating by having contact with the

restrained person). After that, the record shows that mother minimally attended family time, stopped engaging in substance abuse and mental health treatment, and tested positive for illicit substances. The caseworker acknowledged that, when mother was "focused" and "working hard, she d[id] great," but that "only happen[ed] for a certain period of time" before she would regress. Thus, the caseworker opined that, at that point, extending the case any longer would "do more harm than good" for the child.

¶ 57 Mother now contends that she could become fit within a reasonable time, considering her success during most of the case. But the juvenile court considered evidence supporting mother's compliance during the first part of the case, weighed it against contrary evidence of her compliance during the latter part of the case and the needs of the child, and determined that mother couldn't become fit within a reasonable time. Despite mother's success in the first part of the case, considering that she hadn't participated in family time or services for almost eight months at the time of the termination hearing, we discern no error in the court's decision. *See People in Interest of V.W.*, 958 P.2d 1132,

1134-35 (Colo. App. 1998) (even "increased compliance" over the course of a case may not justify additional time).

¶ 58     Mother also argues that she could have become fit within a reasonable time if the Department had provided her services in a timely manner after December 2024.  As for family time services, we rejected this argument in Part V.B.2 above.  And as for other services, mother hasn't established that the Department's lack of efforts, rather than her unwillingness to participate, delayed new referrals after December 2024.  *See A.V.*, ¶ 12.

## E.     Less Drastic Alternatives

¶ 59     Mother asserts that the juvenile court erred by finding that there were no less drastic alternatives to termination.  Specifically, she asserts that an APR to the maternal great-grandmother was a less drastic alternative to termination.  We discern no reversible error.

¶ 60     Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  In considering less drastic alternatives, a court must

27

give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3).

¶ 61 A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 62 To aid the juvenile court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of people the parents identify as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department isn't obligated to "independently identify and evaluate other possible placement alternatives." *People in Interest of Z.P.*, 167 P.3d 211, 215 (Colo. App. 2007).

¶ 63 In addressing whether there was a relative who could be a placement for purposes of a less drastic alternative, the juvenile court found:

- Mother wasn't "forthcoming" about her relatives and that she didn't give the Department much information until three years into the case.

- The maternal great-grandmother "had no idea that the child was in foster care" and hadn't seen the child in a "long time."

- The maternal great-grandmother didn't "speak any English," mother "refused to tell the caseworker what language [great-grandmother] spoke," and the caseworker couldn't get an interpreter as a result.

Based on this information, the court found that the Department "looked at all the relatives" and didn't identify anyone who was an appropriate placement option.

¶ 64 The juvenile court then determined that there wasn't a less drastic alternative to termination, and that termination and adoption were in the child's best interests. Specifically, the court found that an APR was "absolutely not appropriate given [the child's] age and the length of time he'[d] been in out of home placement and foster care."

¶ 65    The record supports the juvenile court's findings. The caseworker testified that the Department did a diligent search for relatives, but the search didn't locate the great-grandmother. The caseworker said that she found out about the great-grandmother when mother disclosed her as a possible placement in March 2025. The caseworker completed a background check and didn't find anything that would disqualify the great-grandmother as a placement. Mother told the caseworker that the great-grandmother would need an interpreter if she wanted to speak to her, but mother wouldn't tell the caseworker what language she spoke so that the caseworker could provide an interpreter. Instead, mother said that she would interpret, but the caseworker didn't believe that was appropriate.

¶ 66    In part because of these delays, the caseworker didn't meet with the great-grandmother until August 2025. The caseworker said that communication with the great-grandmother was "a bit rough" and that she could only communicate with a great-uncle, who also lived in the home. The caseworker noted that it didn't appear that the great-grandmother had seen the child since he was

removed from mother's care and that she hadn't come forward because mother didn't tell her that the child was in foster care.

¶ 67    The caseworker opined that placing the child with the great-grandmother wouldn't be in his best interests.  Specifically, the caseworker testified that "putting him in a home where he [didn't] know the language[,] [didn't] know the people, and . . . [had] never built a relationship with [them] . . . would be very hard on him, and very detrimental."

¶ 68    Despite this record, mother asserts that the juvenile court erred for two reasons, both of which we reject.

¶ 69    First, mother asserts that the Department should have known about the great-grandmother sooner because she mentioned her in a meeting in April 2022.  But mother doesn't direct us to anything in the record showing that she identified the great-grandmother as a placement option before March 2025.  And because the Department isn't obligated to evaluate a relative unless the parent identifies them as a placement option, we discern no error.  *See id.*

¶ 70    Second, mother contends that the Department violated Title VI of the Civil Rights Act of 1964 when it declined to place the child with the great-grandmother because she didn't speak English.  But

mother didn't claim Title VI discrimination in the juvenile court. *See People in Interest of M.B.*, 2020 COA 13, ¶ 14. And we decline her request to address this unpreserved argument because she hasn't developed an argument in support of that request. *See D.B-J.*, 89 P.3d at 531.

¶ 71 Finally, even if the great-grandmother was an appropriate placement option, we still reject mother's assertion because the juvenile court found, and the record shows, that an APR to her wouldn't be a less drastic alternative to termination because the child needed permanency that could only be achieved through an adoption. *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 30.

## VI. Disposition

¶ 72 The judgment is affirmed.

JUDGE J. JONES and JUDGE FOX concur.